# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED

May 09 2018, 5:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kevin Jackson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 9, 2018

Court of Appeals Case No.
49A05-1709-CR-2003

Appeal from the Marion Superior Court.
The Honorable Stanley E. Kroh, Magistrate.
Trial Court Cause No.
49G03-0704-FA-60133

**Darden, Senior Judge**

# Statement of the Case

Kevin Jackson appeals the trial court's decision revoking his probation and ordering him to serve the remainder of his previously-suspended sentence. We affirm.

# Issue

Jackson raises two issues for review, which we consolidate and restate as whether the trial court abused its discretion in revoking his probation and ordering him to serve the remainder of his sentence in the Indiana Department of Correction (DOC).

# Facts and Procedural History

On April 10, 2007, around 4:30 a.m., D.L. and her daughter were sleeping in the same bedroom in the apartment where they lived. D.L. was awakened by a loud noise. Jackson, armed with a knife, had broken into the apartment. He entered the bedroom and stood at the end of D.L.'s bed, obviously intoxicated and swaying back and forth. He told D.L. that he wanted to have sex with her, and he removed his pants. D.L. stood up on the bed, guarding the crib where her daughter slept, and began to scream and bang on the wall. Jackson told her that someone else was outside with a gun and would shoot her if she did not cooperate. Jackson then told D.L. to take off her pants and lie on the bed. D.L. attempted to stall Jackson until help could arrive by telling Jackson that

she wanted to leave the bedroom because her daughter was in the room and suggesting that they first have drinks.

[4] A neighbor heard the banging and screaming and called 911. When the police arrived at the apartment, Jackson dropped the knife, put his pants back on, and walked into the living room to meet the police. Jackson was taken into police custody.

[5] Jackson was charged with attempted rape, burglary, and intimidation. In June of 2007, his attorney requested, and the trial court ordered, the appointment of two psychiatrists to evaluate Jackson's competency to stand trial and his sanity at the time the offense was committed. Dr. George Parker evaluated Jackson and diagnosed him with chronic schizophrenia, borderline intellectual function, alcohol abuse, cannabis abuse, and cocaine abuse. Jackson reported to Dr. Parker that he had experienced auditory hallucination, visual hallucinations, and paranoia since 2005. Jackson was prescribed and took an antipsychotic medication, both before his arrest and while in jail, but he continued to have visual hallucinations at the time of Dr. Parker's interview. He had been receiving disability benefits for his mental disorders since 2006. He sometimes used alcohol to self-medicate and reported that alcohol intoxication calmed him down.

[6] Dr. Parker found Jackson's intelligence was "in the range of low normal." Appellant's Confidential App. Vol. II, p. 53. Dr. Parker concluded that Jackson was competent to stand trial, and determined that Jackson had the

mental disease of chronic schizophrenia but that he was "primarily under the influence of a voluntary, drug-induced intoxication" at the time of the offense. *Id*. at 56.

[7] Dr. Ned Masbaum also evaluated Jackson and diagnosed him with "Delusional Disorder, Schizophrenia, Paranoid Type" as well as "Probable Personality Change Due to Alcohol & Substance Abuse/Dependence." *Id*. at 59. Dr. Masbaum concluded that Jackson was competent to stand trial and that he was of sound mind at the time of the offense. Based on the evaluations of Dr. Parker and Dr. Masbaum, the trial court found Jackson to be competent to stand trial.

[8] On November 2, 2007, Jackson pleaded guilty to attempted rape as a Class A felony.[1] Under the plea agreement, the other charges were dismissed. Pursuant to the plea agreement, the trial court sentenced him to twenty-five years, with twenty years to be served in the DOC, five years suspended, and three years on sex offender probation. He served his time and was released to probation on July 12, 2016.

[9] On March 8, 2017, Jackson's drug screen tested positive for cannabinoids and he admitted to using marijuana to help with his back pain and stress. On March 10, 2017, Jackson also reported that he "had been seeing things almost daily and had been hearing voices intermittently." *Id*. at 189. On March 23,

---

[1] Ind. Code §§ 35-42-4-1 (1998), 35-41-5-1 (1977).

2017, the State requested a modification of the terms of Jackson's probation to add substance abuse evaluation and treatment and mental health evaluation and treatment. Jackson agreed to the added conditions and waived his right to a hearing on the modification. The trial court granted the request that same day. When his probation officer spoke to him about the modifications, Jackson agreed he was experiencing many of the same hardships that he experienced at the time the offense occurred.

[10] On April 13, 2017, the State filed a notice of probation violation, based upon Jackson's admissions that he used marijuana, alcohol, and spice while on probation; that he had failed to report for a substance abuse evaluation; and that he violated the rules of the sex offender treatment program. The trial court issued a no-bond warrant for Jackson's arrest, and he was arrested on April 13, 2017.

[11] On June 30, 2017, without objection from Jackson, the trial court issued an order concluding that Jackson had violated the conditions of his probation. However, his probation was continued with the following added conditions: home detention; alcohol monitoring and tests three times per week; and participation in substance abuse treatment, mental health treatment, and sex offender treatment. Again, Jackson did not object and he was placed on what the trial court's order termed "strict compliance," and he was warned that any proven probation violation would "result in [five] years [in the] DOC." Appellant's Public Access App. Vol. II, pp. 212, 214.

[12]     Jackson was released from custody on July 4, 2017. However, within a few days later, on July 17, 2017, the State filed a second notice of probation violation, alleging that Jackson failed to submit to a drug screen as directed. The notice was amended on July 20, 2017, to include that Jackson also failed to comply with the conditions of home detention, by stopping at unapproved locations, and by failing to submit to three alcohol tests. Specifically, the second amended notice alleged the following. On July 18, 2017, Jackson had an approved pass to attend an appointment at a housing organization, but he stopped at a Dollar General store without approval on the way to the appointment. A community corrections officer met with Jackson that day to remind him he was not allowed to travel outside of direct travel to and from pre-scheduled locations. Subsequently, on July 19, 2017, Jackson had an approved pass to attend a scheduled drug test, but he made unapproved stops at a CVS drug store, Dollar General, a Speedway gas station, and a Work One office on the way home. On that same day, Jackson again missed three alcohol breath sensor tests between 7:12 p.m. and 11:11 p.m. On July 20, 2017, the trial court issued a no-bond warrant for Jackson's arrest, and Jackson was arrested.

[13]     The hearing on the probation violation was held on August 4, 2017. Jackson admitted that on July 18 and 19, 2017, he had gone to Dollar General, Speedway, and CVS, while traveling to and from approved locations. He also admitted that he "missed a few" alcohol breath sensor tests. Tr. p. 5. The deputy prosecutor responded as follows:

The last time we were in Court was on June 30, 2017, Mr. Jackson was continued on probation with strict compliance, Marion County Community Corrections, home detention was added as a condition of probation as well as alcohol monitoring. My notes specifically say from Megan Durbin, who was the probation officer at that time, at that hearing, any proven violation from then on would result in Mr. Jackson serving his full back up of the five year [sic] in the Department of Correction. We're back in Court not even a month later with violations of both the home detention and the alcohol monitoring that was just added on June 30th. He was given a verbal warning on July 18th and reminded of how the conditions work for Community Corrections, that he cannot go anywhere without permission first. Haley Howell is who talked to him, she went over it again with him, not only two days later, he then did the same exact thing. He had an approved pass to go to take a drug screen, from 10:00 to 12:00, which is approved, that's what he was allowed to do. However, he was trailed to a CVS, Dollar General, Speedway and Work One, so he again went places without permission when he had just been reminded how Community Corrections [sic] two days before. He also missed, one, two, three alcohol tests on July 19th. And then Ms. Howell notes that on July 20th, he took one test, but it was too dark to see if it was him or not, so that one doesn't count either. Judge Carlisle specifically told him future violations equals full backup, so it's probation's recommendation at that time that he does his full five years in the Department of Correction.

*Id*. at. 7-8.

[14] Jackson then offered mitigating evidence. He testified specifically that he did not fully comprehend the terms of his probation and that, "I thought that since I was waiting on the bus I'd be able to go to a gas station to get something to drink." *Id*. at 10. Jackson further testified he has schizophrenia, which causes

him to "have trouble remembering things and going about my daily routine," and that he was "just now understanding the rules and everything" regarding home detention. *Id*. at 9, 11.

[15] Jackson asked the court if it revoked his probation, that it reduce his sentence and place him on home detention, along with mental health treatment. The State requested that Jackson's probation be revoked and that he serve the remaining five years in the DOC. The trial court accepted Jackson's admission and took into consideration his request for alternative sentencing; however, it found that he violated the terms of his probation, revoked his probation, and sentenced him to five years in the DOC. Specifically, the court determined:

> The Court having reviewed the file and having – and the Court does take notice of it's [sic] entire file, having considered the evidence and argument, the – the Court has to consider what was addressed at the previous hearing, Mr. Jackson, and the nature of this offense as well, it's a very serious offense. The Court does believe that your probation should be revoked and that you do serve the five years at the Indiana Department of Correction.

*Id*. at 12. The court continued as follows:

> But the problem, Mr. Jackson, is that you were on strict compliance for the previous violation, so the Court's hope was that you would be – bring yourself back into compliance by following the conditions that were set out. I can tell the parties that Judge Carlisle has reviewed the letters that were sent to the Court on behalf of Mr. Jackson. I've also seen those today, but due to the serious nature of [the] offense and the prior violation where Mr. Jackson was placed on strict compliance, the Court –

*****

> I understand, Mr. Jackson, this is a – for you and your family, it's a very difficult decision the Court has reached, but I really have to abide by the previous order. There was [sic] previous violations, as I look through the file. Probation just has not been something that's working out here. And the nature of the offense, it's attempt [sic] rape, it's a serious charge. The Court, for these reasons, does believe the sentence – the full suspended time should be served as an executed sentence.

*Id*. at 12-13, 14.

[16]    Jackson appeals.

# Discussion and Decision

[17]    The issue is whether the trial court abused its discretion in revoking Jackson's probation and ordering him to serve the remainder of his previously-suspended five-year sentence in the DOC. "Probation is a matter of grace left to trial court discretion, not a right to which a criminal defendant is entitled." *Prewitt v. State*, 878 N.E.2d 184, 188 (Ind. 2007). Probation revocation is a two-step process. First, the trial court must determine that a violation of a condition of probation actually occurred. *Woods v. State*, 892 N.E.2d 637, 640 (Ind. 2008). Second, the court must determine if the violation warrants revocation of probation. *Id*. Where, as here, a probationer admits to the violation, the court can proceed to the second step of the inquiry and determine whether the violation warrants revocation. *Id*. But even a probationer who admits the

allegations against him must still be given an opportunity to offer mitigating evidence suggesting that the violation does not warrant revocation. *Id*.

[18]
> "We review a trial court's sentencing decision in a probation revocation proceeding for an abuse of discretion." *Puckett v. State*, 956 N.E.2d 1182, 1186 (Ind. Ct. App. 2011) (citing *Abernathy v. State,* 852 N.E.2d 1016, 1020 (Ind. Ct. App. 2006)). An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id*. A defendant cannot collaterally attack the propriety of an original sentence in the context of a probation revocation proceeding. *Id*. However, a defendant is entitled to challenge the sentence a trial court decides to impose after revoking probation. *Id.* (citing *Abernathy,* 852 N.E.2d at 1020 (citing *Stephens v. State,* 818 N.E.2d 936, 939 (Ind. 2004) ("A defendant is entitled to dispute on appeal the terms of a sentence ordered to be served in a probation revocation proceeding that differ from those terms originally imposed."))).

*Johnson v. State*, 62 N.E.3d 1224, 1229-30 (Ind. Ct. App. 2016).

[19] Jackson asserts that the trial court revoked his probation based upon its belief that it was required to do so because Jackson had been placed on strict compliance. According to Jackson, this deprived him of his right to due process. He further argues that the trial court abused its discretion in sentencing him to the full five years in the DOC because he had "well-documented mental limitations and mental illness, and the [probation] violations were fairly minor in nature." Appellant's Br. p. 15. The State responds that Jackson's due process rights "were adequately protected . . . despite the existence of a strict compliance order," as Jackson "was afforded the opportunity to present the

court with evidence to explain why he failed to comply with the terms of probation," and the trial court "noted [Jackson's] prior [probation] violation as justification for revoking [his] probation." Appellee's Br. p. 9. It further argues that Jackson was warned about "the potential consequences of failing to abide by the terms of probation," and that "[g]iven the special circumstances of this defendant and the circumstances that existed at the time he committed the underlying offense, [the probation] violations are not minor." *Id.* at 9-10. In his reply brief, Jackson contends that the trial court disregarded the mitigating evidence he presented at the revocation hearing because it believed it was bound by the strict compliance order.

[20] In support of his arguments, Jackson cites *Woods*, *Sullivan v. State*, 56 N.E.3d 1157 (Ind. Ct. App. 2016), and *Hampton v. State*, 71 N.E.3d 1165 (Ind. Ct. App. 2017). In *Woods,* Woods was placed on probation that the parties referred to as "'strict compliance,'" meaning "'[any] other violation of any terms or conditions of his probation will result in full backup of 15 years.'" *Woods*, 892 N.E.2d at 639. The State alleged Woods failed to report for urinalysis drug testing, failed to report to the probation department, and failed to make a good-faith effort to pay fees, and the trial court revoked his probation. *Id.* On appeal, this court affirmed the trial court. *Woods v. State*, 877 N.E.2d 188, 189 (Ind. Ct. App. 2007), *trans. granted*. On transfer, our supreme court disapproved of the trial court's lack of discretion to determine what sanction to impose. In its analysis, the court recognized that:

[i]n one sense all probation requires "strict compliance." That is to say probation is a matter of grace. And once the trial court extends this grace and sets its terms and conditions, the probationer is expected to comply with them strictly. If the probationer fails to do so, then a violation has occurred. But even in the face of a probation violation the trial court may nonetheless exercise its discretion in deciding whether to revoke probation.

In any event the very notion that violation of a probationary term will result in revocation no matter the reason is constitutionally suspect. For example, failure to pay a probation user fee where the probationer has no ability to pay certainly cannot result in a probation revocation. And what of a probationer not reporting to his probation officer because he was in a coma in a hospital? Or consider a failed urinalysis test because of prescription medication a probationer is taking on orders from his treating physician. Although not a defense to revocation, lack of volition is often a factor pertinent to a disposition in a revocation proceeding.

We acknowledge that telling a defendant that he is on "strict compliance" is a dramatic way of putting him on notice that he is on a short leash and has been given one final chance to "get his act together." Nonetheless due process requires that a defendant be given the opportunity to explain why even this final chance is deserving of further consideration.

*Woods*, 892 N.E.2d at 641 (internal citations omitted). The *Woods* court held that the trial court erred by denying Woods the opportunity to explain why his admitted violation should not result in revocation of his probation.[2] *Id*.

---

[2] The *Woods* court ultimately determined, however, that, although the trial court erred by not allowing Woods the opportunity to explain why his violation was deserving of further consideration, Woods was not entitled to relief because at trial he did not make an offer of proof, nor did Woods "make any attempt" on

In *Sullivan*, a panel of this court addressed a similar situation where a plea agreement contained a provision that the prosecutor referred to as "[z]ero tolerance probation." 56 N.E.3d at 1160. Among other things, Sullivan received concurrent sentences of twenty-four months, but the plea agreement directed that he would serve eighteen months on electronically-monitored home detention, so long as he maintained eligibility through community corrections, including abiding by all rules of home detention and remaining current on fees, and if he failed to establish eligibility, "the sentence will be served in the Decatur County Jail." *Id.* at 1158. The plea agreement continued:

> The defendant has been advised that the Court has discretion to determine the sanction if the defendant has been found to have violated the rules and guidelines of Community Corrections. The defendant hereby waives this right and agrees that if found to have violated these rules or otherwise become ineligible (except for non-payment of fees due to a change in economic circumstances) then the remaining portion of the defendant's executed sentence shall be served at the Decatur County Jail.

*Id.* The State filed a petition to revoke Sullivan's community corrections placement, alleging that he failed to report to home detention as required. At the revocation hearing, Sullivan testified that he did not report to home detention as required, but explained that he was an inpatient at a mental health facility and that he contacted his then-legal counsel and thought that counsel

direct appeal or on transfer "to explain why he violated the terms of his probation." 892 N.E.2d at 642. Accordingly, the trial court's judgment, revoking probation, was affirmed. *Id.*

had contacted community corrections. Ultimately, the trial court ordered that "'[a]s required by the terms of the Plea Agreement[,]'" Sullivan's community corrections sentence was revoked, and he was ordered to serve his sentence at the DOC. *Id.* at 1160.

[22] On appeal, Sullivan did not dispute that he did not report as required. Rather, he argued that the trial court abused its discretion in imposing such a harsh sentence under the circumstances, including among other factors that he was in a mental health hospital on the day he was to report. Discussing the *Woods* decision, the *Sullivan* court determined that the provision of Sullivan's plea agreement which provided that any non-fee violation would automatically result in the revocation of his community corrections placement was "constitutionally suspect." *Id.* at 1162 (citing *Woods*, 892 N.E.2d at 641). The *Sullivan* court noted the trial court's "belief that it was required to revoke Sullivan's placement by the terms of the plea agreement." *Id.* The *Sullivan* court concluded that "[b]ased on the totality of the circumstances, including the nature of the violation and sanction," the trial court abused its discretion in finding that Sullivan's violation warranted revoking his community corrections placement and in ordering him to serve eighteen months in the DOC, and it remanded the matter for Sullivan to be placed in community corrections. *Id.* at 1162, 1163.

[23] In *Hampton*, Hampton admitted to a probation violation and was ordered to serve the balance of her previously-suspended sentence. The State agreed to stay execution of the sentence for approximately six months. At the six-month

mark, a review hearing would be held and, if Hampton had completed all requirements of probation, the sentence would be withdrawn and Hampton would remain on probation. If, however, Hampton had not completed the requirements of probation by the time of the review hearing, the sentence was to be "'executed immediately.'" *Hampton*, 71 N.E.3d at 1167. At the time Hampton entered into the agreement, the trial court explained that if she subsequently violated her probation, "there would be no formal hearing, no evidence, and no witnesses to hear or cross-examine," and that the trial court would not have the authority to later change or alter the terms of the agreement. *Id*. at 1167-68. Hampton acknowledged that she understood the terms of the agreement, and the trial court approved the agreement.

[24] Six months later, at the review hearing, Hampton did present evidence as to why her probation should not be revoked. The trial court found, however, that Hampton had not successfully completed all the probation requirements, as she did not call the drug screen line on all dates required, and she failed to make required payments toward costs, fees, and restitution. The trial court noted that it lacked the authority to change the agreement and ordered Hampton to serve her full suspended sentence of 550 days in the DOC. *Id*. at 1168.

[25] Hampton filed a motion to reconsider, and at a hearing held on the motion argued, among other things, that she substantially complied with the agreement and that she was denied due process because the agreement took away the trial court's discretion as to what sentence to impose for the probation violation. The State argued that the agreement was validly reached and executed, that

Hampton knew the consequences of a parole violation, and that Hampton received all required due process. The trial court agreed with the State and denied Hampton's motion to reconsider. *Id.*

[26] On appeal, we found that, unlike in *Woods*, Hampton was given the opportunity to introduce evidence was to why her probation should not be revoked. However, in light of *Woods*, and applying the reasoning of *Sullivan*, we rejected the State's argument that the agreement was akin to a plea agreement where, once accepted, the terms were binding upon the parties and the trial court, specifically: "'[w]e reject this comparison. A defendant who enters a plea agreement knowingly, intelligently, and voluntarily is hardly similarly situated to a defendant who is advised in essence either agree to strict compliance or go to jail now for violating probation.'" *Id.* at 1174, quoting *Woods*, 892 N.E.2d at 640 n.2. We remanded the matter to the trial court "for it to determine the appropriate sanction to impose for Hampton's violations of its order." *Hampton*, 71 N.E.3d at 1174.

[27] Here, like in *Hampton*, Jackson presented evidence at the probation revocation hearing as to why his probation should not be revoked. Thus, we find that Jackson's due process rights were preserved and considered by the trial court. At the conclusion of the hearing, the trial court determined that Jackson's probation should be revoked, and the court ordered Jackson to serve his previously-suspended five-year sentence in the DOC. In making its determination, the court noted that it took judicial notice of Jackson's "entire file," and "considered the evidence and argument" and the "serious nature of

[the underlying attempted rape] offense." Tr. pp. 12, 13. Although the trial court twice referenced that Jackson had been placed on "strict compliance," unlike in *Hampton*, it did not base its decision regarding Jackson's probation revocation and sanction solely on that basis. Our review of the record reveals that the trial court considered all of the arguments presented, including those made by Jackson and his attorney, and letters sent to the court on behalf of Jackson, before deciding whether to revoke Jackson's probation and order him to serve his previously-suspended sentence. We, therefore, conclude that the trial court did not abuse its discretion, or violate Jackson's due process rights in revoking his probation and ordering him to serve his previously-suspended sentence in the DOC.

# Conclusion

[28] For the foregoing reasons, the judgment of the trial court is affirmed.

[29] Affirmed.


Riley, J., and Robb, J., concur.